UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

Nº 08-CV-0930 (JFB) (ETB)
_____

THOMAS V. SCHULTZ, JR.,

Plaintiff,

VERSUS

THE INCORPORATED VILLAGE OF BELLPORT, FRANK C. TROTTA, ROBERT LYONS III, JOHN N. ORLANDO, J. LEE SNEAD, ROBERT A. GREEN, ROGER A. TERREL, SCOTT AUGUSTINE, DONALD MULLINS, HUGH MONTGOMERY, PAUL BODNARCHUK, SCOTT RASCELLES, OFFICER STEWART # 13,

Defendants.

_____

**MEMORANDUM AND ORDER**
September 30, 2010
_____

JOSEPH F. BIANCO, District Judge:

Plaintiff Thomas Schultz ("plaintiff") brings this action against the Incorporated Village of Bellport ("the Village") and various Village of Bellport trustees and employees (collectively "defendants") alleging violations of his due process rights pursuant to 42 U.S.C. § 1983. Specifically, plaintiff alleges that defendants violated his substantive due process right to conduct a business by damaging plaintiff's reputation through a pattern of harassment that included an arrest of plaintiff for trespassing. Before the Court is defendants' motion for summary judgment. For the reasons set forth below, the Court grants defendants' motion for summary judgment in its entirety.

I. BACKGROUND

The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the parties' respective Local Rule 56.1 statements of facts.[1] Upon

---

[1] In their reply brief, defendants argue that plaintiff has failed to comply with Local Civil Rule 56.1 because he did not properly respond to Defendants' Joint 56.1 Statement ("Defs.' 56.1") and that, therefore, defendants' 56.1 statement must be deemed admitted. The Court agrees that plaintiff failed to respond specifically to defendants' 56.1 statement and failed to provide any record citations

consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of N.Y.*, 422 F.3d 47, 50 n.1 (2d Cir. 2001). Unless otherwise noted, where a party's 56.1 statement is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.

---

for any of the factual assertions in his own 56.1 statement. Plaintiff's opposition brief also does not cite to the record. Generally, a "plaintiff['s] failure to respond or contest the facts set forth by the defendants in their Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed." *Jessamy v. City of New Rochelle*, 292 F. Supp. 2d 498, 504 (S.D.N.Y. 2003) (quoting *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.*, 262 F. Supp. 2d 134, 139 (S.D.N.Y. 2003)). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted); *see also Gilani v. GNOC Corp.*, No. 04 Civ. 2935 (ILG), 2006 U.S. Dist. LEXIS 23397, at *4-5, 2006 WL 112062 (E.D.N.Y. Apr. 26, 2006) (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). Here, although plaintiff did not contest defendants' 56.1 statement and did not cite to the record in his own 56.1 statement, plaintiff's 56.1 statement does provide some outline of plaintiff's factual position. Thus, both the Court and defendants are able to discern the factual evidence upon which plaintiff is relying to create material issues of disputed fact to overcome summary judgment. Accordingly, in the exercise of its broad discretion, the Court will overlook this defect and will deem admitted only those facts in defendants' Rule 56.1 statement that are supported by admissible evidence and not controverted by other admissible evidence in the record. *See Jessamy*, 292 F. Supp. 2d at 504.

A. The Parties

1. Plaintiff

Plaintiff Thomas V. Schultz, Jr. has lived in the Village of Bellport, Suffolk County, since 1994, except for an 18-month period between 2003 and 2005 when he lived in nearby East Patchogue.

2. Defendants

Defendant Frank Trotta was the Mayor of Bellport at all relevant times. (Defs.' 56.1 ¶ 9.) Defendants Lyons, Orlando, and Snead were members of the Village Board of Trustees. (*Id.* ¶ 10.) Defendant Terrel was the Village Clerk. (*Id.* ¶ 12.) Defendant Green was the Village Attorney, and defendant Augustine was the Assistant Village Attorney. (*Id.* ¶¶ 11, 13.) Defendant Mullins is the Village's Chief Code Enforcement Officer, and defendants Montgomery, Bodnarchuk, Rascelles, and Stewart all either are, or were, Code Enforcement Officers for the Village. (*Id.* ¶¶ 14-16.)

B. Plaintiff's Coffee Shop Business

During the relevant time period, plaintiff ran two coffee shops in Bellport. First, from 1998 until October 2004, he ran a coffee shop called "Kitchen & Coffee" at a commercial building located at 143 South Country Road. (*Id.* ¶ 17.) The owners of the building at 143 South Country Road did not renew plaintiff's lease in 2004. (*Id.* ¶ 19.)

The month after he left 143 South Country Road, plaintiff re-opened his coffee shop business at 8 Bellport Lane with a new name: "Coffee." (*Id.* ¶ 24.) Plaintiff had a lease with

2

Carla Hollander, who operated an ice cream shop in the same building. (*Id.* ¶¶ 26-27.) The lease period was from November 1, 2004 to August 2005, at which point the parties were free to renegotiate the lease. (*Id.* ¶ 27.) The parties to the lease agreed that plaintiff would pay certain sums of money for the location only "if occupied." (*Id.* ¶ 28.)

C. Plaintiff's Political Involvement

At some point in late 2004 or early 2005, plaintiff became politically involved in the community and decided to run for Village Trustee in the upcoming June 2005 election. (*See* Pl.'s 56.1 ¶ 2.) Plaintiff alleges that Village officials viewed him and his coffee shop as a threat to their power and popularity and, therefore, targeted him because of his "activism." (Defs.' 56.1 ¶¶ 116-17.)

D. Plaintiff's Arrests

In March 2005, while he was running for trustee, plaintiff was arrested once and given an appearance ticket on another occasion.

1. The Village Hall Incident

At about 7:00 p.m. on March 4, 2005, plaintiff was jogging past the Bellport Village Hall. (Defs.' 56.1 ¶¶ 31-32.) As a general matter, the Village Hall was open from 10:00 a.m. to 4:00 p.m. (*id.* ¶ 42; Defs.' Ex. J.), although some committees met later in the day (Defs.' 56.1 ¶¶ 43, 45), and the Building Department was open from 5:00 p.m. to 6:00 p.m. (*See* Defs.' 56.1 ¶ 43; Defs.' Ex. J.)

While jogging by, plaintiff noticed two code enforcement cars parked outside and saw two individuals watching television in a room in the south corner of the building. (Defs.' 56.1 ¶¶ 33-34.) Plaintiff retrieved his camera from his home, went back to Village Hall, and walked through the open gate and onto the lawn, positioning himself near the window so that he could see the officers watching television. (*Id.* ¶¶ 35-36; Pl.'s Dep. at 93:6-12.) Plaintiff took several photographs of the officers through the window. (Defs.' 56.1 ¶ 37.) Officer Paul Bodnarchuk, a defendant in this case, came to the door. (Pl.'s Dep. at 95:15-18.) Plaintiff accused the officers of wasting taxpayers' money. (Defs.' 56.1. ¶¶ 38-40.) Plaintiff then returned home. (*Id.* ¶ 41.)

According to plaintiff, the defendants then conspired to have him arrested. At his deposition, plaintiff testified that a Village employee named Denise advised him that the Village trustees were discussing the fact that plaintiff was taking pictures of the code enforcement officers. (*Id.* ¶ 127.) Plaintiff also testified that a Village employee named Mike from the Highway Department said that "they" were talking about plaintiff's alleged trespass, but plaintiff did not ask who Mike meant by "they." (*Id.* ¶¶ 128-29.)

Three days later, two detectives of the Suffolk County Police Department (who are not defendants here) arrived at plaintiff's coffee shop and questioned him regarding the trespass. (*Id.* ¶¶ 49-50.) Plaintiff admitted to the police that he was on village property on March 4, 2005 at around 7:00 or 7:30 p.m. and that he was taking pictures of code enforcement officers watching television. (*Id.* ¶ 55; Schultz Dep. at 62:25-63:6, 74:15-75:2.) Based in part on admissions by plaintiff, the detectives decided to arrest him. (*See* Mehnert Decl. Ex. L (police arrest report).) The detectives allowed plaintiff to close up his shop (Pl.'s

3

Dep. at 64:3-8.), and then led him about 75 to 100 yards down the street where they handcuffed him. (Defs.' 56.1 ¶ 52.) Plaintiff was taken to the Fifth Precinct station in Patchogue in an unmarked car. (*Id.* ¶ 53.) He was issued a desk-appearance ticket for criminal trespass in violation of New York Penal Law § 140.10. (*Id.* ¶ 54.) Plaintiff was ultimately acquitted of the charge. (Pl.'s Ex. O.)

Following the arrest, an article entitled "Trustee candidate arrested" appeared in the *Long Island Advance*, a local newspaper. The story detailed the circumstances of plaintiff's arrest. (*Id.* ¶ 57.) The Village does not run or control the newspaper. (*Id.* ¶ 58.) Defendant Green, defendant Bodnarchuk, and plaintiff were quoted in the article. Defendant Bodnarchuk, who was in the Village Hall and saw plaintiff taking the pictures, gave his version of the events. (*See* Pl.'s Ex. I.) Defendant Green is quoted as saying: "I question [plaintiff's] motivation . . . [b]ut that's up to the DA and the courts to decide what his motivation was. Why do you walk around the building taking photographs?" (*Id.*)

2. Municipal-Yard Trespass

Three weeks after the Village Hall incident, on March 25, 2005, plaintiff took several bags of garbage from "Coffee" to the Village "municipal yard," which is where garbage is collected and which is available for use by village residents and businesses. (Defs.' 56.1 ¶ 61.) The gate to the yard was open. (*Id.* ¶ 68.) Plaintiff backed his vehicle up to a dumpster and proceeded to deposit some of the bags of garbage. (*Id.* ¶ 62.) At that point, plaintiff was advised by code enforcement officer Hugh Montgomery, a defendant in this case, that the municipal yard was closed for Good Friday and that he had to leave. (*Id.* ¶¶ 63, 69; Pl.'s Dep. 104:8-16, 109:9-11.) Plaintiff left the municipal yard immediately. (Defs.' 56.1 ¶ 64; Pl.'s Dep. at 111:2-6.)

At some point shortly after March 25, 2005, the Suffolk County Police served plaintiff with an appearance ticket and misdemeanor information based upon his alleged trespass at the municipal yard. (*Id.* ¶¶ 71-73.) The service was made at plaintiff's coffee shop, and a few customers were present. (*Id.* ¶ 72; Pl.'s Dep. at 99:10-12.) Plaintiff was not taken into custody. (Defs.' 56.1 ¶ 74.) Plaintiff was ultimately acquitted of this charge. (Pl.'s Ex. O.)

E. Outdoor Seating

As noted above, plaintiff leased the space he used for "Coffee" from Carla Hollander. Sometime in the spring of 2005, Hollander was told by village officials that she needed to have a permit for her outdoor seating.[2] Plaintiff acknowledges that he was required to have an outdoor-seating permit when he operated his previous business, "Kitchen and Coffee." (Pl.'s Dep. 179:8-15.) Hollander told plaintiff that she believed the Village was enforcing the permit regulation against her because of her association with plaintiff. (*Id.* 181:13-182:2;

---

[2] Plaintiff testified that Hollander told him that she had never been required to have a permit for outdoor seating before she rented the premises to plaintiff. (Pl.'s Dep. 178:25-179:4.) However, plaintiff presents no affidavit from Hollander. Accordingly, this is hearsay and therefore not admissible to oppose summary judgment. In any event, even if admissible, this evidence would not alter the Court's determination on the claims in this case for the reasons discussed *infra*.

4

*see also* Pl.'s Ex. J.) However, the Village ultimately allowed Hollander to keep the outdoor seating, although it is unclear whether she was required to get a permit. (Pl.'s Dep. 185:12-186:6.)

### F. Boat Slip

Although not directly related to plaintiff's coffee shop business or his arrests, plaintiff and some of the defendants also sparred during this time period over a boat slip at the Village Marina. Only "residents" of Bellport were eligible to rent boat slips. (Defs.' 56.1 ¶ 77.) At some point, the Village redefined the term "resident." (*Id.* ¶ 78.) Because plaintiff had moved out of the Village for a period of 18 months, he was no longer considered a "resident" for purposes of boat slip rental eligibility. (*Id.* ¶ 79.) Plaintiff was nevertheless permitted to rent a boat slip, although the Village attempted to recover a non-resident fee from him and filed a lawsuit against him to collect the fee. (*Id.* ¶ 80.)

Around the time of the June 2005 trustee election, defendant Mayor Trotta referred to the pending lawsuit in a letter to the editor that was published in the *Long Island Advance*. Trotta stated that plaintiff "still owes the village $500—and is forcing the village to sue him to collect . . . ." (Pl.'s Ex. F.)

### G. The June 2005 Election

Three people—plaintiff, defendant Lee Snead, and Phil Gallo—were running for two open positions in the June 2005 trustee election. Snead and Gallo, both of whom were incumbent trustees, defeated plaintiff.

(Pl.'s Dep. at 330:16-331:23.)[3]

### H. Issues with Plaintiff's Lease and the End of His Coffee Business

Plaintiff's lease with Hollander was due to expire in August 2005. After August 2005, plaintiff continued to operate "Coffee" in Hollander's ice cream shop on a month-to-month tenancy until March 2006, at which point plaintiff no longer operated any coffee shop. (Defs.' 56.1 ¶¶ 29-30.) Hollander told plaintiff that she did not want him leasing the building because his reputation was hurting her business. (Pl.'s Dep. at 27:6-32:5.) Plaintiff asserts that he was unable to find a new location for his shop because of his declining sales and tarnished reputation. (*Id.* at 32:6-36:24, 142:4-43:15.)

### I. Additional Incidents

After "Coffee" closed, plaintiff began employment as a legislative assistant to State Assemblywoman Patricia Eddington. (Defs.' 56.1 ¶ 104.) Plaintiff alleges that his relationship with Ms. Eddington changed in 2007 after she had a conversation with defendant Terrel. (*Id.* ¶ 107.) Ms. Eddington's chief of staff terminated plaintiff's employment on June 18, 2007 and advised plaintiff that Ms. Eddington was "having difficulty with [plaintiff's] employment in her office as it relates to the issues with Bellport Village." (*Id.* ¶¶ 106, 109.)

Plaintiff also alleges that he was given various tickets throughout the time in question.

---

[3] At his deposition, plaintiff testified that Gallo is not a defendant in this case because he is deceased. (Pl.'s Dep. at 332:12-15.)

5

(Defs.' 56.1 ¶ 118.)[4] For instance, on April 9, 2007, plaintiff was given a ticket for displaying a "painter wanted" sign on the lawn of his house and alleges that he was the only person who received this violation in 2007. (Pl.'s Exs. R, S.) Plaintiff also claims that various defendants made defamatory statements about plaintiff in connection with his chairmanship of the Bellport Film Society, eventually leading to plaintiff's resignation from that organization. (Defs.' 56.1 ¶¶ 86-96; 101.) Furthermore, plaintiff alleges that defendants made various threatening remarks to him in public. For example, after plaintiff had announced his political candidacy, defendant Orlando allegedly told plaintiff that he was "going to be cut to pieces." (Pl.'s Dep. at 282:18-24.) Defendant Lyons allegedly said that plaintiff "made a mistake by taking on the police. They're an army you cannot beat." (*Id.* at 282:24-83:3.)

As a result of all of the above-discussed conduct by defendants, plaintiff alleges that his reputation suffered and he was unable to continue with his coffee shop business. (Defs.' 56.1 ¶¶ 124-25.) When defendant John Orlando was served with process in the instant lawsuit, he allegedly stated to plaintiff: "It was wrong what was done to you." (Pl.'s Ex. X.)[5]

---

[4] Plaintiff admits that he was also given about three to five tickets prior to his political candidacy. (Pl.'s Dep. at 288:14-16.)

[5] Plaintiff also alleges that defendant Mullins pushed him on the dock at one point in 2001 or 2003. (Pl.'s Dep. at 281:3-13.) He also alleges that defendant Snead threatened plaintiff in 2001 or 2003. (*Id.* at 307:9:18.) There is no allegation that any of these acts were connected to the alleged campaign of harassment in response to

J. Procedural History

Plaintiff filed the complaint in this action on March 4, 2008. Plaintiff filed an amended complaint on October 6, 2008. On October 10, 2008, the Court so-ordered a stipulation between the parties dismissing all of plaintiff's state-law claims, which included abuse of process, false arrest, and malicious prosecution. The stipulation also dismissed any claims arising from the enactment of legislation regarding the boat slip residency requirement as against defendants Frank C. Trotta, Robert Lyons III, John N. Orlando, and J. Lee Snead. The Court so-ordered another stipulation on July 1, 2009, which dismissed all of plaintiff's claims against defendant Adam R. Friedlander.

Defendants submitted a motion for summary judgment on December 7, 2009. Plaintiff submitted an opposition dated January 22, 2010.[6] Defendants replied on March 5,

---

plaintiff's political candidacy, and, thus, any claim based on these events is time-barred.

Plaintiff also alleges that he was pushed by a person at a Village board meeting in September 2005, but this individual is not named as a defendant in this action. (Pl.'s Ex. N.)

[6] In connection with his opposition, plaintiff submitted the transcript of an audio recording of a conversation on June 25, 2008 between Jim Datri and defendant John Orlando. (Pl.'s Ex. Y.) Defendants argue that because this audio recording was not provided to them during discovery, despite specific requests for any such recordings, the Court must not consider the exhibit under Rule 37 of the Federal Rules of Civil Procedure. The Court need not decide whether plaintiff's failure to provide the exhibit during discovery should preclude consideration of the evidence because, in any event, even if the Court considered this evidence, the Court concludes that defendants would

6

2010. Oral argument was held on April 8, 2010. The motion is fully submitted.

## II. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Reiseck v. Universal Commc'ns of Miami, Inc.*, 591 F.3d 101, 104 (2d Cir. 2010). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (emphasis in original)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

## III. DISCUSSION

At oral argument, the Court asked plaintiff's counsel to clarify what claims he was asserting. Plaintiff's counsel stated that he was asserting a "substantive due process" claim and a "1983 conspiracy" claim. (*See* Oral Argument Audio FTR at 3:17-18.) As set forth below, the Court concludes that neither of these claims can survive summary judgment. Additionally, in an abundance of caution, the Court has analyzed plaintiff's claim under a "stigma-plus" procedural due process theory and concludes that defendants are entitled to

---

nevertheless be entitled to summary judgment on all of plaintiff's claims for the reasons discussed *infra*.

7

summary judgment on that claim as well.

Plaintiff brings his claims under 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979).[7] For claims under § 1983, a plaintiff must prove that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999) (citation omitted). Here, the parties do not dispute that defendants were acting under color of state law.[8] The question presented, therefore, is whether defendants' conduct deprived plaintiff of the rights he asserts under the Fourteenth Amendment.

A. Substantive Due Process Claim

The Due Process Clause of the Fourteenth Amendment protects persons against deprivations of "life, liberty, or property." U.S. Const. amend. XIV, § 1. However, the scope of substantive due process is very limited. *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). The Supreme Court has said that it is "reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992).

To establish a substantive due process violation, a plaintiff must (1) identify the constitutional right at stake and (2) demonstrate that the government's action were conscience-shocking or arbitrary in the constitutional sense. *Little v. City of N.Y.*, 487 F. Supp. 2d 426, 443 (S.D.N.Y. 2007) (citing *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994)). The "shock the conscience" standard is not easily met; the plaintiff must show the government conduct was "'egregious'" and "'outrageous,'"[9]

---

[7] Specifically, Section 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

[8] To succeed on a § 1983 claim, a plaintiff must also establish that a defendant was personally involved in the alleged constitutional deprivation. *See Gronowski v. Spencer*, 424 F.3d 285, 293 (2d Cir. 2005) ("Before § 1983 damages are awarded, a plaintiff must show by a preponderance of the evidence that the defendant was personally involved—that is, he directly participated—in the alleged constitutional deprivations."). Here, plaintiff's allegations against a number of the defendants rely purely on conjecture. (*See generally* Pl.'s Dep. 305:9-325:2).) As such, although the Court does not reach the issue given the other bases for granting summary judgment, there is a serious question as to whether plaintiff has produced sufficient evidence that most of the defendants were personally involved in any alleged constitutional violations.

[9] *Okin v. Village of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 431 (2d Cir. 2009) (quoting

not "not merely incorrect or ill-advised." *Ferran v. Town of Nassau*, 471 F.3d 363, 369-70 (2d Cir. 2006) (quotation omitted).[10] As set forth below, the Court determines that, even if plaintiff's evidence is credited and all reasonable inferences are drawn in his favor, no rational jury could conclude that plaintiff has established (1) a deprivation of a liberty interest or (2) that defendants' actions shocked the conscience or were constitutionally arbitrary.

1. Liberty Interest

Here, plaintiff argues that he had a liberty interest in running his coffee shop business. He claims that defendants infringed on this interest because, in an effort to undermine plaintiff's political aspirations, they engaged in a campaign to tarnish his reputation by, *inter alia*, having him arrested. He further alleges that defendants' alleged campaign had the "collateral effect of destroying [his] business." (Pl.'s Opp. Mem. of Law at 3 ("To reduce the probability of [plaintiff] prevailing in the election, the Village undertook a course of conduct to destroy him. It also had the collateral effect of destroying his business.").)

It is well settled that a person has a liberty interest in "'engag[ing] in any of the common occupations of life.'" *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 632 (2d Cir. 1996) (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)). Case law indicates, however, that a substantive due process claim based on infringement of this or similar rights will succeed only where a person is blocked from participating in a particular field. *See Conn v. Gabbert*, 526 U.S. 286, 291-92 (1999) (noting the existence of Supreme Court case law supporting "some generalized due process right to choose one's field of private employment" but also noting that cases in this area "all deal with a complete prohibition of the right . . . ."); *Rodriguez v. Margotta*, 71 F. Supp. 2d 289, 296 (S.D.N.Y. 1999) ("It is well settled that one must have no ability to practice one's profession at all in order to state a claim for deprivation of a liberty interest."); *see also Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 404 (3d Cir. 2000) (observing that "[t]he Supreme Court has already held that *Meyer* may not be read to constitutionalize all executive actions that affect the pursuit of a profession in any way").

Similarly, courts have found that a pattern of harassment directed at a business can constitute a substantive due process violation in some circumstances. *See, e.g.*, *State of Texas v. Thompson*, 70 F.3d 390, 393 (5th Cir. 1995) (finding material issues of fact precluded summary judgment on due-process claim where there was evidence that defendant had directly contacted plaintiff's customers and told them that plaintiff was a "habitual law breaker"). *See generally Chalfy v. Turoff*, 804 F.2d 20, 22 (2d Cir. 1986) ("[A] true pattern of harassment by government officials may make

---

*Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)).

[10] *See also Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 505 (2d Cir. 2001) ("As we have held numerous times, substantive due process 'does not forbid governmental actions that might fairly be deemed arbitrary or capricious and for that reason correctable in a state court lawsuit. . . . [Its] standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority.'" (quoting *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999))).

out a section 1983 claim for violation of due process of law." (collecting cases)).

However, because the Supreme Court has cautioned against expansion of the scope of substantive due process rights, *see supra*, courts are reluctant to convert employment related defamation claims into substantive due process claims. In *Boyanowski*, for example, an employee of a government-run competitor of plaintiff's school bus company publicly called plaintiff a "crook" and claimed that plaintiff had been a poor manager when he had previously worked for the competitor. The Third Circuit reversed a jury's verdict that had found a substantive due process violation based on the competitor-employee's comments. The court acknowledged such comments would have "some effect on an individual's ability to navigate the often treacherous waters of government contracting, but" declined "to leap to the broad level of generality necessary to classify the harm in substantive due process terms" because to do so "would constitutionalize broad swaths of state tort law." 215 F.3d at 404.

Applying these principles here, there is no evidence from which a rational jury could find that defendants infringed upon plaintiff's liberty interests. Even assuming *arguendo* that some or all of the defendants caused the injuries to plaintiff's reputation, there is no evidence that their actions, standing alone, directly blocked plaintiff from participating in the coffee shop business, nor is there evidence that they took direct action to undermine plaintiff's business. To use plaintiff's own phrase, the alleged injuries to his business were a "collateral effect" of defendants' alleged political campaign against him. Given the attenuated relationship between defendants' alleged actions and the injury to plaintiff's business, there is, as a matter of law, no basis to find that defendants' alleged actions give rise to a substantive due process claim. As noted at oral argument, to hold otherwise would mean that a substantive due process claim could arise anytime someone receives negative publicity as a result of state action and that publicity adversely effects the person's business or employment.

2. Shock the Conscience/Constitutionally Arbitrary

Furthermore, even if plaintiff could establish that defendants infringed on his liberty interests, their alleged actions hardly rise to the conscience-shocking level necessary to succeed on a substantive due-process claim.

As a threshold matter, again, the liberty interest at issue involves plaintiff's coffee-shop business. (*See, e.g.*, Pl.'s Opp. Mem. of Law at 6.) Thus, although plaintiff raises allegations related to, *inter alia*, a boat slip, his membership in the Bellport Film Society, and threatening comments made by defendants on the street, these actions are unrelated to plaintiff's purported liberty interest in running his business.[11] Second, the remaining incidents

---

[11] At oral argument, plaintiff's counsel specifically conceded that there was no connection between the boat slip and plaintiff's occupation. Defendants also argue that the statute of limitations bars recovery for any conduct occurring before March 2005. Plaintiff argues that the conduct was continuing. In order to invoke the "continuing violation" exception, plaintiff must demonstrate that separate incidents were a part of a larger unlawful practice. *See AMTRAK v. Morgan*, 536 U.S. 101, 115-21 (2002); *see also Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d Cir.

do not, as a matter of law, shock the conscience. With respect to plaintiff's arrest for trespassing at the Village Hall, the Suffolk County Police—not any of the defendants—actually conducted the investigation and made the arrest and did so in part based on an admission from the plaintiff.

The news article describing the incident does contain statements from defendant Bodnarchuk, who observed plaintiff on the Village Hall grounds, and from defendant Green, the Village Attorney.[12] Defendant Bodnarchuk describes what he observed plaintiff doing outside the Village Hall. His description of the incident is essentially identical to plaintiff's.[13] Plaintiff asserts that Green's comments were "disparaging" and "inaccurate,"[14] apparently because Green is quoted as asking why plaintiff would "walk around the building." (Pl.'s Ex. I.)[15]

As to the second incident, plaintiff was given an appearance ticket for trespassing based on his alleged dropping-off of garbage at the municipal yard on Good Friday, when, according to defendants, the yard was actually closed.

In sum, in both of the trespassing incidents, plaintiff was admittedly present on the property either after normal working hours or on what at least plausibly could be called a holiday. Moreover, defendants' role in the arrests was essentially as complaining witnesses; the Suffolk County Police actually made the arrest in the first incident and issued plaintiff an appearance ticket in the second.

---

1998) ("[A] continuing violation may be found 'where there is proof of specific ongoing discriminatory polices [sic] or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice'" (quoting *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir. 1994))), *abrogated in part on other grounds by Morgan*, 536 U.S. 101. In this case, plaintiff alleges that defendants engaged in a pattern of harassment based on his political activity beginning in late 2004 or early 2005. Plaintiff does not point to any connection between the alleged conduct prior to March 2005 and the alleged scheme to destroy plaintiff's reputation. In any event, even if the Court considered plaintiff's claims based on the pre-March 2005 conduct to be timely, none of the alleged conduct, as a matter of law, constitutes a deprivation of substantive due process for the reasons discussed *infra*.

[12] (*See* Pl.'s Ex. I.)

[13] (*Compare* Pl.'s Ex. I (newspaper article quoting Bodnarchuk as saying "We opened the door and there's [plaintiff] with a camera going off. He said 'You like watching T.V.?' I said, 'Tom, you've got to be kidding me'") *with* Pl.'s Dep. 96:2-11 ("I asked [the officer] if he enjoyed or liked watching television on taxpayers' time . . . . He kind of shrugged and sighed and slammed the door, the front door of the Village Hall. You know what, he might have said you got to be kidding me. I believe he said that, you got to be kidding me.").)

[14] (Pl.'s Opp. Mem. of Law at 3.)

[15] The Court draws this inference because the copy of the newspaper article filed by plaintiff in opposition to summary judgment contains a hand-written annotation—"walk around building"—with a hand-drawn arrow pointing at Green's quote. (*See* Pl.'s Ex. I.) Plaintiff seems to contend that he was not actually walking around the building, although he admits he was on the property.

Plaintiff also asserts that Village officials attempted to get Hollander—the person from whom plaintiff leased the "Coffee" premises—to obtain a permit for outdoor seating. Plaintiff agrees, however, that Hollander obtained a "favorable resolution" to the situation, and there is no evidence that the permit issue by itself adversely affected plaintiff's business. (*See* Pl.'s Dep. 185:12-186:14.) Under the circumstances, no reasonable jury could find that defendants' actions shocked the conscience or were constitutionally arbitrary. *Cf. Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 252 (2d Cir. 2001) (finding that student and his parents adequately stated substantive due process claim based on allegation that gym teacher had choked student, slammed the back of his head into the bleachers four times, rammed student's head into a metal fuse box, and punched him in the face). *See generally Espanola Way Corp. v. Meyerson*, 690 F.2d 827, 830 (defendants not entitled to summary judgment in case involving allegation that defendants had violated plaintiff's property interests where, *inter alia*, 344 building-code violations had been issued for plaintiff's hotel). Thus, plaintiff's substantive due process claim cannot withstand summary judgment.

B. Procedural Due Process Claim

As noted above, plaintiff's counsel explicitly stated at oral argument that he was asserting a "*substantive* due process" claim. Plaintiff's papers, however, refer to "due process stigma cases." (*See* Pl.'s Opp. Mem. of Law at 6.) As explained in more detail below, "stigma-plus" is a theory of relief on a *procedural* due process claim. *See generally Doe v. Mich. Dep't of State Police*, 490 F.3d 491, 502 (6th Cir. 2007) ("The stigma-plus test is used to determine whether state action violates an individual's procedural due process rights. . . . Our review of the caselaw has failed to identify any case that applies the stigma-plus test to a substantive due process claim." (internal citations omitted; collecting cases)). Even assuming plaintiff is attempting to assert a procedural due process claim, it cannot survive summary judgment.

1. Applicable Law

Generally, damage to a person's reputation is not enough to invoke the Due Process Clause. *See Paul v. Davis*, 424 U.S. 693, 701 (1976). These types of injuries usually provide a basis only for state-law defamation claims, not federal constitutional torts. However, a plaintiff can bring a § 1983 due process claim on a so-called "stigma-plus" theory—that is by showing "'a stigmatizing statement plus a deprivation of a tangible interest.'" *Vega v. Lantz*, 596 F.3d 77, 81 (2d Cir. 2010) (quoting *Algarin v. Town of Wallkill*, 421 F.3d 137, 138 (2d Cir. 2005)). "To establish a 'stigma plus' claim, a plaintiff must show (1) 'the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false,' and (2) 'a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights.'" *Id.* (quoting *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004)). Stigma-plus claims often arise in the public-employment context where, for example, an employer is alleged to have made defamatory statements in connection with firing the plaintiff.[16]

---

[16] *See Valmonte v. Bane*, 18 F.3d 992, 1001 (2d Cir. 1994) (describing "defamation in conjunction with termination of government employment" as "the clear situation that satisfies the 'stigma plus'

Here, no rational trier of fact could find that plaintiff was deprived of procedural due process. As a threshold matter, there is no evidence that any defendants—with the possible exception of defendant Green, *see supra*—made any false or defamatory statements in connection with plaintiff's arrests or the resulting publicity.

Moreover, plaintiff has presented no evidence from which a rational jury could find that the "plus" portion of the "stigma plus" standard has been met. That is, even assuming defendants made defamatory statements and these statements resulted in a stigma, plaintiff would still need to show something more—*i.e.*, the "plus"—to succeed on a constitutional claim. Reputational injury, standing alone, is insufficient. For example, in *Sadallah v. City of Utica*, 383 F.3d 34 (2d Cir. 2004), the plaintiffs operated a restaurant on property they leased from the City of Utica. The defendants—city officials—were alleged to have made various false and disparaging statements about, *inter alia*, the condition of the property and the improper storage of chemicals in the food-preparation area. The plaintiffs sued, asserting, *inter alia*, a § 1983 stigma-plus due process claim. They claimed that defendants' statements caused reputational and financial harm to their business. The Second Circuit reversed the district court's denial of a motion to dismiss. The court stated that "'deleterious effects [flowing] directly from a sullied reputation,' standing alone, do not constitute a 'plus' under the 'stigma plus' doctrine." 383 F.3d at 38 (quoting *Valmonte v. Bane*, 18 F.3d 992, 1001 (2d Cir. 1994) (alteration in original)). The court went onto explain that, although plaintiffs alleged lost business as a result of defendants' statements, those injuries were not "in addition to" the alleged defamation but instead were a direct result of the defamation. *Id.*[17] As such,

---

test"); *Sacco v. Pataki*, 114 F. Supp. 2d 264, 271 (S.D.N.Y. 2000) (explaining that the "plus" requirement of a stigma-plus claim "has been met in most cases by dismissal from government employment"); *see, e.g.*, *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 631 (2d Cir. 1996) (reversing district court's grant of summary judgment where comments made in connection with assistant principal's termination were "so harsh as to be likely to persuade any other school board not to hire plaintiff as a supervisor").

[17] *See also Valmonte*, 18 F.3d at 1001 ("Our prior decisions indicate, as does *Paul v. Davis,* that defamation is simply not enough to support a cognizable liberty interest. It therefore follows that the deleterious effects which flow directly from a sullied reputation would normally also be insufficient. These would normally include the impact that defamation might have on job prospects, or, for that matter, romantic aspirations, friendships, self-esteem, or any other typical consequence of a bad reputation."). The Court recognizes that a stigma-plus claim may arise where the employer makes statements that "denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession." *Donato*, 96 F.3d at 630-31. However, unlike the instant case, *Donato* arose in the context of the plaintiff's termination from her job as a school assistant principal, and the statements at issue directly impugned plaintiff's abilities as a school administrator. In contrast, statements regarding plaintiff's trespassing arrests did not occur in the context of termination from public employment nor do they directly call into question plaintiff's competence to run a coffee-shop business. Thus, the instant case is much more analogous to the situation in *Sadallah* than to

even if the defendants' statements were defamatory, they did not rise to the level necessary to state a due process violation. *Id.* at 38-39.

*Sadallah* is directly on point. Plaintiff complains of injuries resulting from "the deleterious effects . . . of a sullied reputation." Accordingly, although he could potentially have other, state law claims against defendants, he cannot, as a matter of law, succeed on a "stigma-plus" due process theory. Accordingly, any procedural due process claim cannot survive summary judgment.[18]

### C. Conspiracy Claim

Plaintiff alleges, pursuant to § 1983, that defendants conspired to deprive him of due process. For the reasons set forth below, the Court grants defendants' motion for summary judgment on plaintiff's § 1983 conspiracy claims.

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999).

As a threshold matter, plaintiff has not established that defendants violated his constitutional rights. *See supra*. Accordingly, his § 1983 conspiracy claim fails as a matter of law. *See Singer v. Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) (explaining that a § 1983 conspiracy claim "will stand only insofar as the plaintiff can prove the *sine qua non* of a § 1983 action: the violation of a federal right"); *D'Angelo-Fenton v. Town of Carmel*, 470 F. Supp. 2d 387, 397 (S.D.N.Y. 2007) ("[T]o succeed in a § 1983 conspiracy claim, a plaintiff must prove not only a conspiracy, but an actual deprivation of a constitutional right.").

Furthermore, in the alternative, the Court concludes that plaintiff presents no evidence from which a rational jury could find the existence of a § 1983 conspiracy. Although plaintiff testified that village employees told him some of the defendants were discussing his trespass at the Village Hall, this does not establish an agreement to inflict an unconstitutional injury. *Cf. Scotto v. Almenas*, 143 F.3d 105, 114-15 (2d Cir. 1998) (explaining that evidence of communications between various defendants was not, by itself, sufficient to defeat summary judgment on § 1983 conspiracy claim). Beyond this, plaintiff's conspiracy claim is based on speculation and conjecture.[19] This is plainly insufficient to survive summary judgment. *See, e.g.*, *Williams v. Cnty. of Nassau*, 684 F. Supp. 2d 268, 290-92 (E.D.N.Y. 2010) (granting summary judgment on § 1983 conspiracy claim).[20]

---

*Donato*.

[18] As noted *supra*, plaintiff agreed by stipulation to dismiss his state-law claims.

[19] (*See, e.g.*, Pl.'s Dep. 299:8-11 ("I believe there was a discussion that took place with regard to [plaintiff's arrest] and there were players involved and we need to know who was involved.").)

[20] Defendants also argue that the intra-corporate conspiracy doctrine bars plaintiff's conspiracy claim. Because the Court dismisses the conspiracy claim on multiple other grounds, it does not reach

Accordingly, because there is (1) no underlying constitutional violation and (2) no evidence of an agreement to inflict unconstitutional injury on plaintiff, the Court grants defendants' motion for summary judgment on plaintiff's claims of conspiracy under § 1983.

### D. Qualified Immunity

Defendants also argue, in the alternative, that they are entitled to summary judgment on all claims based on qualified immunity. As set forth below, the Court agrees.

According to the Second Circuit, government actors may be shielded from liability for civil damages if their "conduct did not violate plaintiff's clearly established rights, or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003). "A right is clearly established when the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right. . . . The unlawfulness must be apparent." *Connell v. Signoracci*, 153 F.3d 74, 80 (2d Cir. 1998) (citations and quotation marks omitted). In addition, the Second Circuit has repeatedly stated that qualified immunity only protects officials performing "discretionary functions." *See Simons v. Fitzgerald*, 287 F. App'x 924, 926 (2d Cir. 2008) ("'Qualified immunity shields government officials performing discretionary functions from liability for civil damages . . . .'" (quoting *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007))).

Here, with respect to the incidents discussed more fully in Parts III.A and B, qualified immunity protects the defendants. There is no evidence that any defendant violated plaintiff's clearly established constitutional rights in complaining to the police regarding plaintiff's alleged trespasses or in determining that Hollander's building might need an outdoor-seating permit. As such, even if plaintiff could establish a constitutional violation (which he cannot for the reasons discussed above), defendants would be entitled to qualified immunity.

### V. CONCLUSION

For the reasons discussed above, the Court grants defendants summary judgment. The Clerk of the Court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 30, 2010
Central Islip, New York

\* \* \*

Plaintiff is represented by Edward M. Gould, Jr., Esq., 374 Islip Ave., Suite 104, Islip, NY 11751. Defendants are represented by Michael A. Miranda, Miranda Sambursky Slone Sklarin Verveniotis LLP, 240 Mineola Blvd., Mineola, NY 11501.

---

the intra-corporate conspiracy argument.